**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**BEAUMONT GEREAU, ISHMAEL LA BEET, WARREN BALLENTINE, MERAL SMITH, and RAPHAEL JOSEPH, Defendants**

Crim. No. 97-1972

District Court of the Virgin Islands

Div. of St. Croix

July 23, 1973

57

JULIO BRADY, ESQ., United States Attorney, Christiansted, St. Croix, V.I., *for plaintiff*

MARIO N. DeCHABERT, ESQ., Christiansted, St. Croix, V.I., *for defendant Gereau*

WILLIAM M. KUNSTLER, ESQ., New York, N.Y., *for defendant Gereau*

RONALD T. MITCHELL, ESQ., St. Thomas, V.I., *for defendant La Beet*

CHAUNCEY ESKRIDGE, ESQ., Chicago, Illinois, *for defendant La Beet*

LEROY MERCER, ESQ.,Christiansted, St. Croix, V.I., *for defendant Ballentine*

MARGARET L. RATNER, ESQ., New York, N.Y., *for defendant Ballentine*

LEROY MERCER, ESQ., Christiansted, St. Croix, V.I., *for defendant Smith*

RONALD T. MITCHELL, ESQ., St. Thomas, V.I., *for defendant Joseph*

YOUNG, *Judge*

## OPINION ON MOTION TO SUPPRESS

This matter came before the Court on the defendants' Motion to Dismiss or Suppress. The motion was filed December 20, 1972, on behalf of all defendants.[1] It asks the Court to dismiss the information, or, in the alternative, to suppress any statements taken from the defendants and any tangible evidence obtained as a result thereof. By an Order dated March 9, 1973, I granted the defendants' application for an evidentiary hearing in connection with their motion. The hearing commenced April 16 and consumed twenty-one full court days (and 5,460 transcript pages of testimony). The present Opinion represents my conclusions from that hearing.

## I. INTRODUCTION

This is a prosecution for the mass murders, assaults, and robberies committed on September 6, 1972, at the Fountain Valley Golf Course in St. Croix. The crime was reportedly committed by a number (5 to 7) of heavily armed young men wearing masks and army fatigues. The men entered the clubhouse area in the middle of the afternoon and at some point opened fire indiscriminately with a variety of weapons, including a .45 caliber submachine gun. Eight people were killed and four others wounded. The gunmen robbed some of the victims, apparently after they were shot. They also took the money from the snack bar cash register and the Sales Area cash drawer and then fled into the hills surrounding the golf course. By nightfall they had still not been apprehended despite intensive search. The police then directed their principal efforts toward a more systematic investigation of the crime.

[1] An earlier motion to suppress was filed September 18, 1972, on behalf of defendants La Beet, Ballentine and Joseph. However this motion was never noticed for hearing and will be considered as having been merged in the motion of December 20.

They were aided in this by the Federal Bureau of Investigation, whose agents began to arrive in St. Croix on the following day. A command post and headquarters for the enlarged force of law officers was set up in the Pro-shop of the golf course.[1.5]

Defendants La Beet, Ballentine and Joseph became the immediate suspects. All three had been sought for sometime and had been in hiding, or at least had escaped the eye of the police, for several months. The police were aware that they would be difficult to locate directly. About thirty other young men, contemporaries and associates of the prime suspects, were therefore sought out and brought to Fountain Valley for questioning. These individuals were not considered suspects themselves but rather as possible leads for locating the missing trio. Defendants Smith and Gereau were among this group. Attention began to focus on Smith when, on the morning of his arrest, the police searched his room and discovered ammunition, a bandanna that appeared to be a mask, a Fountain Valley matchbook, and other items tending to link him with the crime. Attention focused on Gereau when the police learned that he had been seen in the company of the trio the night before the murders and that he had been seen leaving his father's house with "a long gun." Both men were extensively questioned and ultimately made statements which implicated the remaining three defendants. La Beet, Ballentine and Joseph were finally located on September 12 and were also taken into custody.

 During their investigation, the police accumulated a considerable body of evidence. This includes confessions from each of the defendants and a sizeable collection of weaponry and army clothing. Among the weapons is a .45

---

[1.5] This location was offered by the golf course management and accepted because it could accommodate a large number of men while the local police stations could not.

caliber machine gun. The defendants have now moved to suppress all evidence and have assigned a number of reasons for doing so. The reason most strongly pressed, and the one which I will examine first, is a claim that the police resorted to systematic tortures in order to obtain confessions from them. If this were so, the confessions would of course be inadmissible. Most of the tangible evidence, through a more or less complex investigative chain, would then become "fruits of the poisonous tree" and inadmissible as well.

After prolonged consideration, assisted by the excellent and (perhaps necessarily) lengthy briefs filed by both sides, I find myself unable to accept the claim that tortures were used against these defendants. Accordingly no evidence will be suppressed on this ground. On the other hand, however, I do believe that the police improperly questioned Smith and Joseph in the absence of an attorney. Any statements taken from these defendants will therefore be inadmissible at trial. For similar reasons, although confined to a single episode, any statements given by Gereau on September 14 will likewise be excluded. Finally, I will also suppress certain tangible evidence to which Joseph led the police; his assistance in this regard must be seen as a fruit of his earlier and improperly-obtained confession. All remaining evidence, however, will not be suppressed.

With that, I shall turn first to the most important issue presented: the allegation that during the arrest and questioning of these defendants the police consistently resorted to torture, brutality, or otherwise coercive tactics.

## II. VARIOUS ACCOUNTS OF POLICE CONDUCT

The brutality issue does not lend itself to a terse statement of each side's factual contentions. On the contrary, most of the four week suppression hearing was taken up

with sharply conflicting accounts of almost every phase of the police investigation. This issue is being considered first because it lies at the foundation of many of the reasons which the defendants advance for suppressing evidence. They urge that not only were confessions coerced, and hence not admissible in evidence, but furthermore that such unlawful confessions were the basis for subsequent arrests and searches. While I have resolved in my mind what actually happened, the statement of my conclusion seems best deferred until the later sections in which I will examine the credibility of the witnesses. At this point I will merely relate the defendants' versions and then the Government's version of the facts.

*1. Smith.*—Smith was the first defendant to be arrested, being taken into custody just before dawn on September 7th, the morning after the murders. He claims that brutality began immediately, even before he reached the police headquarters at Fountain Valley for questioning. He was knocked to the ground as he emerged through a window of his room; he was kicked, banged with the police car door and repeatedly threatened. Events took a still more serious turn after Smith was brought to Fountain Valley. He was tortured at intervals throughout the entire day, chiefly in a small storage room. These tortures included pistol whippings, electric shocks to the ears and genitals, and beatings with fists, blackjacks and the shock club. Police officers Hatcher and Hansen were apparently the chief tormentors. Similar tortures were inflicted on the following day,[2] and were supplemented by a hanging at about noon. Smith claims he was taken to a tree near the putting green, jerked off the ground about twenty times

---

[2] It appears that in his direct examination Smith was occasionally confused about the sequence of days at Fountain Valley. The chronology used in this opinion appears the most reasonable interpretation of Smith's account, considering his testimony as a whole and cross-checking it with that of the other defendants.

in a fifteen minute period, and then returned for further questioning. It was not until the evening of the second day that he finally broke and made his first statement. Similar tortures preceded the additional confessions which he gave on the third day.

The Government's report of these days is radically different. A large number of police and FBI officers testified as to this period, accounting for all the significant time which Smith spent in custody. The arresting officers testified that the defendant was taken without incident to a waiting car. Thereafter, at Fountain Valley, he was questioned intermittently and without violence. Throughout the day, even after some incriminating evidence had been found in his room, he was still regarded as a lead to the primary suspects rather than as being himself a potential participant in the murders. Smith was taken to the Frederiksted jail for the night and was returned for more questioning the following morning. The interview began about 3:30 and ended—after the local Chief of Detectives Ann Schrader assured Smith that his companions could not take reprisals—when he signed a statement at 8:35 that evening. On the third morning Smith was told that Gereau had implicated him. He thereupon furnished two additional statements describing the crime in more detail. Throughout all of the sessions, the Government witnesses maintain, Smith was never in any way threatened or maltreated.

*2. Gereau.*—Gereau was arrested a day after Smith, in the midmorning of September 8th. He was likewise taken to Fountain Valley and interrogated at intervals throughout the day. He made no statement that day, nor does he claim that any physical force was used against him. The only coercion he claims was psychological: the police told him that helicopters and ground troops would be called in to

64

kill La Beet, Ballentine, and Joseph, and that only he could save them. The brutalities which Gereau alleges were confined to a brief period the next morning. He was then awakened by a blow with a machine gun, shocked on his genitals with an electric prod, and taken outside and repeatedly hanged from a tree until he almost passed out. He was then questioned later that morning and made a confession after being threatened with renewed hangings.

The Government's account is again quite at variance with this. Its witnesses report that Gereau was seated on the putting green until midafternoon of the day of his arrest, along with a number of other young men who had been brought in for questioning. He was then examined between the hours of 3:00 and 7:30 by Sergeant Hansen for about half an hour and by three FBI agents thereafter. The four officers testified that he was cooperative, that he spoke freely of other incidents, and that no threat to use helicopters was made. Gereau spent the night in a room at Fountain Valley and was aroused the next morning by officers Hatcher and Hansen. Hansen said, "It seems as if you got a lot on your chest; why don't you get it off?" To which Gereau replied, "Hansen, give me a couple of hours." The two policemen then left the room. Three FBI agents and Patrolman Hatcher returned about half an hour later and began their questioning. By 11:02 Gereau had given a signed statement of his participation in the murder-robbery. The interviewing law enforcement officers were unanimous in stating that the defendant was not mistreated at any point during this period.

*3. La Beet.*—La Beet, Ballentine, and Joseph were finally arrested together on the early afternoon of September 12th. They were placed in separate cars and driven

to Fountain Valley, where they arrived about 3:15.[3] For the rest of the afternoon La Beet was shuttled among various rooms, alternately in the custody of the FBI and the local police, at intervals of approximately thirty minutes to an hour. The local police inflicted systematic tortures on him, while the FBI then questioned him without violence. The tortures included beatings, shocking, kicking, placing a plastic bag over his head, and dripping water down his nostrils until near-suffocation resulted. The more unusual incidents should also be mentioned. The first happened shortly after the defendant arrived at Fountain Valley. When Assistant Commissioner of Public Safety Anderson entered the room La Beet stood up and demanded to see his lawyer. In anger Anderson grabbed him by the throat, choked him, pushed him down, and then left the room. The second incident occurred later that day. Sergeant Hansen drove La Beet up a dirt road and threatened to put a knife in his hand, shoot him, and make it look like an escape attempt. After an afternoon of such treatment La Beet confessed to participation in the crime. About 7 o'clock he was driven back to the scene of his arrest where, after further threats, he aided to some extent[4] in locating a machine gun secreted in the outhouse.

The Government's testimony tells of an altogether different strategy of interrogation. According to FBI witnesses three rooms at Fountain Valley were suitable for questioning a suspect. These were the mens' locker room, the ladies' locker room, and a small storeroom (the northwest storage room), all of which open off from the Sales Area at the Pro-shop. When the last three defendants

---

[3] This is the approximate time noted in the FBI logs. The three defendants estimated the time variously, but all put it somewhat earlier in the afternoon. I do not think this point is particularly material, however, and so I will adhere to the FBI's time throughout as the more likely to be correct.
[4] La Beet claims that his assistance in this regard was ineffectual, since he would nod affirmatively to any question as to whether the gun was hidden in a particular place.

were brought in on September 12th, one was taken to each room and they were kept in that room until questioning was completed. La Beet was taken to the ladies' locker room. Agent Patton entered the room about 3:25, began his interview a few minutes later, and pursued it continuously until 7:02. La Beet answered questions freely and made a full statement. Patton was with him continuously, except for one eleven minute absence, and saw no brutality. A confrontation with Anderson did take place, but La Beet had stood up in a surly manner and the Commissioner merely pressed him back into his seat without excessive violence. When the interview ended the defendant was turned over to other officers to retrieve the machine gun whose location he had previously indicated. La Beet did this voluntarily. According to one agent no threats were made and no brutality was engaged in during the trip; and it appears that several agents were close enough to La Beet to have heard any threats that were made. The group then returned to Fountain Valley and remained there without incident until shortly after 10 p.m., when all three defendants were driven into town for presentment before me.

*4. Ballentine.*—Ballentine claims that he was taken to the mens' locker room immediately upon his arrival at the golf course. Little was said or done for the next two hours. After about an hour and a half Hansen stepped in and indicated in a threatening manner that he would be back in half an hour. He was, and Ballentine was then taken to the northwest storage room and experienced the same sort of tortures that La Beet claims were inflicted on him. After about half an hour with the local police he was left with an FBI agent who then took a statement from him. Ballentine was next taken outside to the Sales Area where he sat until 6 o'clock. At 6 and at 6:30, Hansen twice threatened him in order to obtain information about a .250 Sav-

age, but Ballentine professed ignorance about the gun. Hansen then brought him a cot and he slept in the northwest storage room until about 10:30 p.m. when he was awakened to be brought before me for presentment.

The Government's contrary account was presented by a number of the investigating officers, principally FBI agent Frechette. Frechette testified that Ballentine was taken directly to the mens' locker room, where he was interviewed from 3:21 until 4:30. During that period Ballentine never left the room and Hansen never entered it. The FBI agents then left for about two hours, during which time the defendant remained in custody of the local police. The agents remained just outside in the Sales Area, however, where they could have easily heard, but did not hear, the sounds of anyone being mistreated or beaten. In addition, a policeman who remained in the room with Ballentine testified that no brutality took place during that period. Two FBI agents returned at 6:23 and continued the interview until 9:12 p.m. At least one was present with Ballentine at all times and saw no ill-treatment. During this session the defendant voluntarily furnished the agents with a statement.

*5. Joseph.*—Joseph claims that he was taken to the northwest storage room upon his arrival. An FBI agent tried to question him, but Joseph insisted on being put in contact with his lawyer. The agent then left the room and was replaced by essentially the same group of local policemen that the other defendants have named. This group subjected him to tortures of the same sort meted out to La Beet and Ballentine. After this he was taken across the Sales Area to the ladies' locker room for further questioning by FBI agents, at which time he gave two statements. Joseph also alleges three instances of brutality on the following morning before arrival of his court-appointed counsel. He was awakened with a blow from a gun butt

delivered by Hatcher who wanted information as to the location of a .250 Savage. Hansen then coerced him into signing a statement which he had given the previous day. And finally, he was forced to guide the police to a site near Mahogany Road and threatened with death if he did not point out the place where certain evidence had been hidden.

The Government's account of these days was presented principally by Special Agent Jones. Jones began his interview at about 3:30, but terminated it at 3:51 when Joseph indicated that he did not wish to proceed further without a lawyer. Jones left at that time to permit the local police to get some information from Joseph for their own records. He was gone for about an hour, but looked into the room at fifteen minute intervals to check on the activities therein. On those occasions he saw no water on the floor; nor any other signs of tortures; nor did Joseph complain to him. Jones stressed that the door was always opened promptly by the police inside whenever he knocked. One of the policemen there also testified that no mistreatment had occurred. Jones then reentered the room around 5 p.m. and continued the interview until about 10:30. He was present through that period except for a few brief occasions and neither saw nor heard any complaints of brutality. Jones returned to Fountain Valley about 7:45 the next morning. At that time Joseph indicated a willingness to lead the officers to the cache near Mahogany Road. Jones accompanied the defendant and others on this trip, and throughout it he observed no threats directed against him. Hatcher and Hansen similarly denied having participated in any brutality that day.

### III. EVALUATION OF THE BRUTALITY CLAIMS

■ With these conflicting factual accounts thus before me, I must now attempt to cull out the truth. The decision on this issue is obviously important to the case. If the po-

lice did resort to brutality then information obtained in this manner would be inadmissible. Sims v. Georgia, 389 U.S. 404 (1967); Stein v. New York, 346 U.S. 156 (1953). I conclude, however, that no such violation of the defendants' rights occurred. The motion to suppress their statements on this ground will therefore be denied. In outlining my reasons for this decision, I will first discuss the inherent credibility or incredibility of the defendants' accounts. I will then examine the testimony of other witnesses called by the defendants to support their version of events.

### A. INHERENT CREDIBILITY OF THE DEFENDANTS' ACCOUNTS

■ *1. Smith.*—I am, for a number of reasons, unable to accept Smith's account of his interrogation. The most important and wide-sweeping reason is the relative credibility of the defendant and the various police officers who testified against him. I believe the officers were the more credible witnesses, and, moreover, that Smith was motivated by an obvious self-interest in presenting his account of police brutality. This judgment is bolstered by certain demonstrable falsities in his account, the most notable of which is his claim that the police hanged him from a tree near the putting green.

The alleged hanging would have been, first of all, a highly implausible tactic under the circumstances. One would expect that the police would keep any such torture —if they did indeed utilize it—as secret as possible. Yet the tree which Smith pointed out is perhaps the most conspicuous one in the Pro-shop area. It stands in full view of the putting green, the parking lot, and the northerly end of the Pro-shop veranda. Moreover, Smith claims the incident occurred about noon, when all these areas would have been crowded with potential witnesses. There were fifteen to twenty policemen and FBI agents within sight

of the putting green, and numerous spectators (including news reporters) in the parking lot. In addition, a sizeable number of young men from Frederiksted, including Gereau, were seated near the green at that time.[5] I cannot believe that the police would have resorted to hanging under such public circumstances, or that none of the people seeing it would have reported the incident.[6]

Still more conclusively, however, expert testimony indicated that the hanging would not have taken place. To resolve any doubts lingering in my mind I called a nurseryman and horticulturalist as the Court's witness. He examined the tree for any abrasions which would be consistent with a rope slung over a branch and used to hoist a man's weight. He testified quite positively that there were no such scars now, and, if the tree had been so used some nine months ago, that the burn marks would still be evident today. I therefore conclude that the hanging incident did not occur.[7]

Ultimately there is an alternative explanation for Smith's willingness to talk, which does not depend on police brutality and which is generally more plausible. Each

---

[5] These young men claim that they were moved below the brow of a small hill, which would hide the tree from view. Still, the chances that one would stand up and look around seem sufficiently great to make them awkward potential witnesses in any event.

[6] Indeed, Smith claims that the hanging was done with the knowledge of at least two FBI agents, who simply turned their backs and walked away.
There is one other piece of circumstantial evidence against brutality. If Smith had indeed attracted so much attention from the police, I would expect them to have kept him at Fountain Valley on the night of the 7th. It seems unlikely that they would have sent him to the Frederiksted jail, where he might tell others what had happened to him and which, it was testified, is physically quite insecure.

[7] I am reluctant to press the limits of judicial notice too closely, and so my final observation on the hanging incident will be confined to secondary status here. It is worth noting, however, that such repeated hangings as Smith claims would almost certainly have left marks on his neck. Yet, no witness was presented who claims to have seen such signs on either him or Gereau.
Similarly, I might note that no medical reports were introduced, from the time when these defendants had been transferred to the regular jail, which would confirm that they were severely beaten as Smith claims. I find it hard to believe that such beating would not leave marks of a more or less lingering character which would have been observable then.

of Smith's statements was made only after he was confronted with information which the police had in their possession, and in each he implicated himself only as far as that information seemed to make inevitable. By the time he gave his first statement on the 8th, the investigating officers had recovered evidence from 160 Grove Place (ammunition, a mask, and a Fountain Valley matchbook) which tended to link him with the murders. Smith then admitted that the group had stopped at his house after the killings, but denied any direct involvement himself. He made a fully incriminatory statement only on the 9th and after being told that Gereau had confessed, as indeed he had. I find this the more reasonable explanation for Smith's confessions. I cannot credit his testimony as to brutality and so I must find that there was none.

2. *Gereau.*—Gereau's case is no less complicated than Smith's, but it may be treated more briefly here. Many of the considerations are the same. I cannot accept Gereau's credibility as a witness generally, or his account of being hanged in particular—both for the reasons given in connection with the defendant Smith. There might appear to have been a particularly favorable opportunity for brutalizing Gereau, in that at the time of the alleged tortures he was concededly alone with the local police who may have borne a grudge against him. In disproof of this, however, I think it significant that the FBI agents who interviewed him later that morning testified that at no point did Gereau complain to them of any mistreatment.

Other differences between the two cases do not alter my conclusion. Gereau was unable to identify the specific tree from which he was hanged, but he did state that it was one of a small cluster just north of the putting green. The Court's nurseryman witness therefore examined all suitable branches in this group of trees and reported that none of them had been used for hanging. Another possible

difference lies in Gereau's claim that he was hanged early on the morning of the 9th, at an hour when there would be fewer potential witnesses. There were still two FBI agents standing guard on the veranda, however, in a position from which the grove was fully within their view. They testified that no such incident took place. It was light at the time, moreover, and so there was a risk that additional onlookers might be present. Thus here as well the alleged time and place of the event adds to its implausibility. Even if the police decided to hang Gereau (as I find they did not), I cannot believe they would have selected so conspicuous a cluster of trees when there were denser woods close at hand.

*3. La Beet, Ballentine and Joseph.*—These three defendants may be considered together. In brief, I am not persuaded by their accounts of police tortures. Five reasons lead me to this conclusion. The most important is that their versions are squarely contradicted by the reports of numerous agents of both the FBI and the Department of Public Safety. I find these agents the more credible witnesses, both from demeanor and from the detail with which they kept their transportation and interview logs. This judgment is bolstered by the fact that the defendants would have had a more immediate and compelling motivation to fabricate the story that they told.

Secondly, the defendants' version of the police conduct is hardly believable, in that it does not represent any intelligible (even if illegal) line of police inquiry. The rapid shuffling of defendants from room to room would not seem a sensible method of interrogation, since I would think it more effective to use patience and outwait a suspect. Moreover, the police would have been aware of the strong circumstantial evidence against these defendants, and so would be less motivated to jeopardize their entire case by illegally seeking merely cumulative statements. Indeed, the

defendants' willingness to talk may be attributed to their awareness of the strength of this evidence, coupled perhaps with the nervous release of knowing that the long hunt for them was over.

Third, I am strongly influenced by the fact that the defendants did not at the time complain of ill-treatment to any of the responsible Government officials on the scene.[8] If their stories are true, it might be understandable that they would not complain to the line law enforcement officers. But while at Fountain Valley the defendants also had opportunities to speak with administrative officials who could have taken corrective action. These officials included Attorney General Tonkin, Assistant Attorney General Resnick, and Assistant U.S. Attorney Brady; yet no effort was made to tell any of these officers of the alleged brutalities. Similarly, the defendants made no complaint to me when they were presented on the night of their arrest. This silence is all the more remarkable since, at the presentment, the Government made a special motion for permission to return and detain the prisoners at Fountain Valley rather than to lock them up, at that late hour, in Richmond Penitentiary. If the defendants had actually been tortured at Fountain Valley, however, I believe that they would have vehemently insisted on being sent to Richmond instead. A willingness to make complaints known would be quite in character for the defendants, as reading the transcript of this hearing will indicate; conversely, silence in the face of such brutalities would seem out of character.

Fourth, I think it significant that neither La Beet nor Ballentine signed the statement attributed to him. This is consistent with a suspect agreeing to talk but refusing to sign anything, and having both wishes respected. It is less consistent with a hypothesis of police torture, for

[8] This observation is to some extent relevant to the credibility of all five defendants, and not just to the three under discussion here.

74

officers willing to go to those lengths would probably have also insisted that the resulting documents be signed.

Finally, I note that the defendants showed no visible signs of rough handling. To be sure, some of the alleged tortures would leave no marks. But others surely would have. For instance, La Beet, Ballentine and Joseph claim that each of them were viciously beaten and kicked about the body. La Beet goes so far as to aver that two police officers jumped up and down on his chest, with both feet and full weight, while wearing combat boots. Ballentine claims that he was pulled around the floor by his testicles, apparently while his ankles were handcuffed. A doctor examined all three the next day, however, and found no swelling, bruises, or other external signs of injury. He prescribed only aspirin and a laxative. Yet I cannot believe that beatings of the sort described here would not have left some mark. Moreover, the three testified that they did not complain to me at presentment in part because they felt that their injuries were self-evident. Yet I observed them with some interest at the time and noted that they looked tired but nothing worse than that. At least I noticed nothing at all to suggest an inquiry into the possibility of mistreatment.

## B. EVALUATION OF THE OTHER DEFENSE WITNESSES

As is apparent from the preceding discussion, I believe that the brutality claims of the five defendants bear all the earmarks of later fabrication. This conclusion is not altered by the testimony of the corroborating witnesses called by the defense, for the reasons which I will outline below. The weight and credibility of these corroborating witnesses is open to considerable question.

1. *Anthony Powell.*—If there was a star witness for the defense it was Anthony Powell, a former policeman with the Department of Public Safety. Powell was on duty at

Fountain Valley on September 12th,[9] and claims to have seen La Beet tortured in much the same manner that the defendant claims. Powell's testimony is thus doubly important: if believed it would not only support La Beet's own case, but it would also bolster the claims of brutalization of all suspects. For four reasons, however, I cannot accept his version of events.

First, I would give little weight to Powell's testimony under the normal tests of credibility. His demeanor on the stand lacked sincerity and his account of the afternoon is squarely contradicted by what I consider to be less impeachable sources. On the one hand he is contradicted by certain impersonal causal laws. As was discussed above, for example, the beatings that he and La Beet described would have left marks that were not present here. And on the other hand, Powell is contradicted by the testimony of more credible witnesses. FBI Agents Patton and Jimerson accounted for the entire afternoon of the 12th (with a gap of eleven minutes) and testified that no mistreatment occurred. I do believe those statements.

Powell seems to have tailored his testimony to fit the defendants' needs in at least two instances. This may be seen by comparing his testimony in this hearing with the statement he gave the FBI on January 20 during the Justice Department's own investigation into rumors of brutality. The first instance relates to the episode when Commissioner Anderson appeared in the ladies' locker room. Powell's testimony here was that ". . . Commissioner Anderson grabbed him by the throat and started screaming after him and saying, 'I seen eight goddamn people dead out there. . .' and kept on choking him . . . . I know he was being choked." This can be contrasted with Powell's mild prior statement, in which he related that Anderson first

---

[9] He was also there on other days, but his testimony as to those events has little bearing on the issue of brutality.

told La Beet to sit down. When La Beet did not comply, "Anderson put both hands around his neck and forcibly made him sit down . . . . This was done while Anderson was angry and with the object of making La Beet sit down. I do not think that this was done with the purpose of maltreating La Beet." The second instance involves La Beet's reaction when, at Fountain Valley, Powell was alone with him and able to tell him that one of the victims was a black man. In his FBI statement Powell quoted him as saying: "I didn't know that there was a Brother hurt. I wouldn't *want to* hurt my Brother *in that group or I wouldn't have been involved or an expression quite similar to that.* These were his exact words. A.E.P." The words italicized above were lined out and initialed by Powell. In contrast, Powell's testimony in Court was that La Beet reacted merely by saying that ". . . he was sorry that the people were killed or something like that . . . that he [La Beet] hadn't committed any crime."

Third, Powell seems to have engaged in a certain dramatization in his description of the alleged torture sessions. He testified repeatedly that the door to the storage room was locked on these occasions. For example, he reported that shortly after Hansen entered, "[t]hey locked the door, so I stayed in." Similarly, in his statement to the FBI, he said, "Someone, I do not know who, locked the doors." The fact is that no one could have locked the door from the inside, since there is neither an inside lock nor a lever within the edge of the door. It can be locked only by a key from the outside. I would normally regard this variance as of little import, but Powell definitely emphasized a behind-locked-door activity, which I do not believe was possible.

Finally, at least one question mark must be set next to his description of the tortures themselves. Powell testified that he remained with La Beet at all times during the questioning in various rooms. In these circumstances we

would expect him to have seen all of the tortures which La Beet claims to have received. Yet Powell said that he never saw La Beet treated with a wet towel or with a plastic bag.

2. *Mary Mercer.*—Mary Mercer was another key defense witness. She was at Fountain Valley on the 8th and 12th of September in her capacity as an Assistant Attorney General. From her observations on those two days she testified as to several episodes which would strongly suggest that brutality had been used.

A major difficulty with her testimony as to events of the 8th, however, casts considerable doubt on her reliability as a witness. In her statement to the FBI last January she reported that she heard long cries coming from the mens' locker room which continued intermittently for a period of ten to fifteen minutes. Shortly afterwards some local policemen came out of the room with Rupert McIntosh, one of the friends of La Beet, Ballentine and Joseph who had been brought in as part of the effort to locate these suspects. He sat down and cried and appeared quite shaken. This same story was repeated in Mrs. Mercer's testimony in Court.

I cannot believe that this story is correct. McIntosh himself testified at another point in the hearing that he was never in the mens' locker room, or in the Pro-shop, on September 8th. He also stated that no one struck or mistreated him at Fountain Valley on that day. In this direct conflict of testimony I would have to believe McIntosh. He would of course know the truth of the matter, and he would have no motivation to shade his testimony in a direction that would tend to undercut claims of police brutality.[10] Moreover, others sitting at the same operations table have not confirmed Mrs. Mercer's account.

---

[10] As is discussed below, McIntosh appeared as a witness for the defense and in other respects corroborated the defendants' accounts of tortures.

Similar difficulties arise with her testimony regarding the events of September 12th. She stated to the FBI that she was at the operations table in the Sales Area while La Beet, Ballentine, and Joseph were being questioned. She learned that the suspect in the mens' room was Joseph, the one in the ladies' room was Ballentine, and the one in the northwest storage room was La Beet. She then reported two instances of brutality. A policeman "began taking water into the mens' room. During one of those trips, I heard [him] remark 'those guys sure are thirsty.'" Shortly afterwards she heard a scream from the room. A second incident began when Hatcher received a telephone call indicating that the searchers at Hospital Street could not find the machine gun where La Beet had said it was hidden. Hatcher then went back to La Beet who was standing in the Sales Area and punched him in his side stating, "You're a lying mother-fucker, it is not there, let me get you back inside." Mary Mercer repeated this testimony at the suppression hearing.

There are several reasons why I cannot accept this account as accurate. In the first place, the discrepancies as to the events of the 8th raise problems of reliability in my mind. Moreover, neither the screams nor the striking of La Beet have been satisfactorily confirmed, despite the fact that there were many people present and the Pro-shop is built in an open manner which would permit sound to carry easily. Mrs. Mercer said she saw water being regularly carried *into* the mens' room, but this seems unlikely under any set of facts. There are two shower stalls and two wash basins there, and no need to carry water into the room. Her account more generally contradicts the times and locations of prisoners as set out in the FBI logs reviewed above, and so her testimony is in conflict with that of eight FBI agents. Finally, she apparently made no report of these events, at the time, to either her su-

79

periors or her co-workers. I would find this most incredible in a person holding as responsible a position as she did.[11]

*3. Lincoln Williams.*—Mr. Williams' testimony went to a more limited point and tended to substantiate only Smith's claim of ill-treatment. Williams had been asked to come to Fountain Valley and answer some questions, and was later released. While there he was in the mens' room with the defendant. He testified that Hatcher twice came in and took Smith out for questioning. When Smith returned he was crying and holding his side, which to Williams looked swollen and bruised. Williams did indicate that he knew Smith, whom he referred to as "Meral." What diminishes the impact of his testimony in my mind, however, is more the fact that he comes as a midnight witness. He evidently had not reported his observations to anyone before. This is not to say that every eleventh hour witness lacks credibility, but the circumstances here cast a suspicious light on what he said. I give little weight to it.

*4. The Minor Defense Witnesses.*—The defense also called a number of the young men, friends of the missing trio, who had been brought to Fountain Valley during the early days of the hunt for them. These witnesses included Rupert McIntosh, Wayne Payne, Bruno Archibald, and Edwin Joseph. Their testimony dealt primarily with brutality against themselves, although this would of course suggest that similar acts may have been directed against the defendants. I give their testimony little weight, however. In the first place these men are close friends of the defendants, and, more generally, they are simply not credible witnesses. A few more specific reasons may be given

---

[11] The following colloquy will illustrate my reasons for hesitation on this point:

Q (Rauh) "And didn't you feel at that time if you heard a scream that you had a duty to report it, take some action to stop any activities that were causing the screams?"

A (Mary Mercer) "I didn't know it was against the law to scream, Mr. Rauh."

for approaching their testimony with skepticism. For one, Edwin Joseph states that he was hanged from a tree in the same grove that Gereau had indicated, and Wayne Payne claims to have witnessed the event. I disbelieve this story for the same reasons discussed in relation to the similar claims of Gereau and Smith. In addition, there is a special inconsistency in Payne's account. He says that Gereau (or possibly Smith, but this is less likely at that hour) also observed the hanging of Edwin Joseph; yet neither defendant mentioned this in his own testimony. Rupert McIntosh's testimony seems similarly unreliable, since it contradicts that which he had given in the Municipal Court in the "guns and dynamite" case, in which he is a co-defendant. His testimony here also contradicted, in material respects, a statement which he had given to an FBI agent last fall.

5. *Joel Sacks.*—A final witness, the United States Attorney Joel Sacks, deserves mention at this point although he was called as a witness by the Government rather than by the defendants. Mr. Sacks testified to a conversation he had in October with Sergeant Eric Hansen, an officer who figures prominently in the defense allegations of police torture. According to Mr. Sacks, his understanding at the time was that Hansen was admitting to him that tortures had been used. Mr. Sacks was sufficiently certain of his understanding to set in motion the Justice Department's own investigation on this episode.[12]

On the stand in this case, however, Sergeant Hansen denied that he made such a statement and explained that he was only reporting what he had heard that another police officer[13] was going to testify. Mr. Sacks testified that he might have misunderstood: the conversation was

---

[12] The Government, with commendable candor, made this memorandum available to the defendants during the suppression hearing.

[13] I would imagine this was Patrolman Powell, although the record is silent on this point.

81

conducted in very low tones due to the presence of strangers in the next office. I find this explanation credible, not only from its own force but also from the fact that I have concluded, on the basis of independent evidence, that the prisoners were not mistreated.[14] Moreover, Sergeant Hansen's use of language lends itself to such a misunderstanding. I noticed during his testimony that he will slip into the first-person when reporting what another is saying about him. Thus on page 4422 of the transcript the following passage appears:

> During the time I was talking I said to Mr. Sacks, "Yes, some police officer was saying that the FBI could not get them to talk because they didn't know them. And I told the FBI to leave the interrogation room and then [certain officers], and myself, squeezed them a little and defendant Joseph was the hardest one to crack. And I used plastic bags on them. . . ." (Paragraphing omitted.)

Despite this suggestive wording, throughout his testimony Hansen emphasized that he had neither seen nor participated in any brutality. I find this testimony credible.

*6. Statements Admitted by Stipulation.*—In addition to the witnesses who actually testified, the defendants also rely on a number of documents which were admitted by stipulation. These are statements of people who were present at Fountain Valley during the investigation and whose recollections were recorded by the FBI during the Justice Department's inquiry into the allegations of brutality. Several such statements mention the affiant seeing shock batons

---

[14] There is also an alternative explanation of the Sacks-Hansen conversation, which I find rather interesting despite the fact that it has no support in the record. It is conceivable that Sergeant Hansen was annoyed, as perhaps were all local police, by the public credit accorded the FBI for its role in the investigation. He may have concocted a boastful but apparently harmless story to suggest to the prosecution that a greater contribution had been made by the Department of Public Safety. Thus Mr. Sacks would have heard correctly, but it would not follow that tortures were in fact used. I need not decide here which explanation is correct. Suffice it to say that either one would be consistent with, and justified by, the independent conclusion that no brutality occurred.

at the clubhouse. This would confirm that the police had an opportunity to use such tortures, but it does no more than that. The presence of these devices is not itself significant or, I think, particularly startling. Although not regular police issue, shock batons are privately owned by several officers. I would not be surprised to learn that many policemen carried their personal equipment during the manhunt of September 6–12; indeed, a number of unconventional weapons were pressed into service for that period. Carrying a shock baton might be a sensible precaution in case a hostile crowd was encountered. In any event, it is a long step from showing their possession to showing their use against manacled suspects; and in view of the more direct evidence against mistreatment I attach little significance to the affidavits.

## IV. VALIDITY OF ARRESTS

With the brutality issues thus resolved I may consider the remaining aspects of the police investigation in their customary sequence. The arrests of the defendants will be examined first. All five contend that they were taken into custody without probable cause, or in a manner otherwise improper. Their cases will be considered in chronological order. Briefly stated, however, I believe that all arrests were properly made.

■ *1. Smith.*—Smith was taken into custody at his uncle's house, at 160 Estate Grove Place, just before dawn on September 7th. He contends that at the time the police had no probable cause to arrest him. I must disagree, however. Smith's uncle, James Tuitt, had phoned the police with information on two occasions the day before. This information amply justified an arrest on a charge of accessory after the fact for aiding fugitives from justice. Smith was therefore properly arrested on this ground.

83

The fugitives in question were La Beet, Ballentine, and Joseph. An arrest warrant was outstanding against at least La Beet, on a charge unrelated to Fountain Valley,[15] and the police had been greatly desirous of contacting the remaining two about a number of criminal matters.[16] All three had been conspicuously unavailable for some time and were thought to be camping in the hills. Although as far as I know no legal determination of "fugitivity" has been made, and I do not imply one here, the police had probable cause to believe that a court would attribute this status to at least some of the men. By corollary, they had probable cause to arrest anyone who assisted them to remain in hiding.

▪ Tuitt's calls tended to show that both Smith and Gereau were aiding them in this manner. He phoned the police at 1:15 a.m. on the morning of the 6th to report that all five were at his house. Shortly afterward he saw them leave carrying two boxes and a long gun. As they crossed the lighted ball park across the street one box fell apart, revealing canned goods.[17] The group then turned off the lights, gathered up the cans, and moved on. Tuitt next saw the five on the afternoon of the 6th, this time in the hills behind Grove Place and not far from Fountain Valley. Tuitt contacted the police a second time to report this sighting. About eight detectives were sent to look for the men, but they failed to find them and the shootings

---

[15] A bench warrant for him was issued on May 31, 1972, by this Court in Criminal No. 74/1972.

[16] A bench warrant for Raphael Joseph was not issued until September 8, 1972, in Criminal No. 44/1972. The police had been looking for him for some time before then, however. There was no outstanding warrant for Ballentine, but in the later days of August he had failed to appear for sentencing in Criminal No. 83/1971. A bench warrant in that case was issued on September 8.

[17] In later testimony Tuitt seemed to indicate that the boxes were carried by Smith and Gereau alone when this incident occurred. Given the prior circumstances this would still constitute probable cause for an accessory charge. Even if it would not, however, the reasonableness of police conduct must be judged according to the information they had at the time.

occurred at the golf course before the search group reported back to headquarters. Since La Beet, Ballentine, and Joseph were the immediate suspects in the murders, Tuitt's information acquired additional importance. He was therefore brought to Fountain Valley about 7:00 that evening and interviewed by the Chief of Detectives Ann Schrader. His observations were reduced to written form, signed, and became the basis for Smith's arrest early the next morning.[18]

██ Smith argues, and correctly, that mere innocuous public consortium with criminals does not necessarily constitute a criminal act itself. United States v. DeRi, 332 U.S. 581, 593 (1948). But his activities here went beyond those of innocent association. Helping to carry large quantities of canned goods would be active assistance to persons who planned to remain in hiding. Moreover, the circumstances suggest that Smith was aware of the fugitive status of the trio. Carrying canned goods in the very early morning hours and shutting off the field lights to have the cover of darkness both indicate that the group considered secrecy important. In addition, past efforts to locate the trio had received widespread publicity of which Smith was likely to have been aware.[19]

Smith advances one final argument. Even if the police had probable cause, under normal circumstances, to arrest him as an accessory, the arrest here was invalid because it was a mere pretext for interrogating him about the more

---

[18] Both Tuitt and the sources of his information seem sufficiently reliable for the police to have acted on them. United States v. Harris, 403 U.S. 573 (1971). This is particularly true since Tuitt was a private citizen rather than a paid or otherwise professional informant. Tips from such quarters are more likely to be reliable, see United States v. Unger, 12 Crim. L. Rptr. 2250 (7th Cir. Nov. 28, 1972). Moreover, Miss Schrader had known Tuitt personally for many years.

[19] I may also take judicial notice of the fact that Smith knew the police were seeking Ballentine for sentencing in Criminal No. 83/1971. In the weeks prior to Fountain Valley, Smith was in this Court twice as his bail bond surety to answer questions as to Ballentine's whereabouts. He was told that Ballentine had failed to appear and that his presence was desired.

serious crimes at Fountain Valley. See, e.g., United States v. Edmons, 432 F.2d 577 (2nd Cir. 1970). This argument is without merit, however, since Smith's arrest lacks the characteristics of those "pretext arrests" which have been found unlawful. In such cases the defendants were generally arrested after surveillance, in bad faith, on petty and discretionary charges, and solely as an excuse to obtain information on other matters. E.g., Green v. United States, 386 F.2d 953 (10th Cir. 1967) (vagrancy arrest); Amador-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968) (traffic arrest). Here Smith was arrested after a citizen complaint, in good faith, on a serious and nondiscretionary charge of aiding and abetting fugitives, which charge did not come to the attention of the police during surveillance related to the primary crime. Such an arrest does not suffer from the severe dangers of abuse which mark arrests on more trivial grounds. Accord, Abel v. United States, 362 U.S. 217, 225–30 (1960). While Smith might not have been sought with such vigor had it not been for Fountain Valley, he could have been legitimately sought in any event.[20]

---

[20] Alternatively, the police arrested Smith on a second ground—trespass—again at the instance of Mr. Tuitt. Indeed, the officer who first arrested Smith told him only of this ground for doing so. The detachment of policemen had been told of both reasons, however, at a 3:00 a.m. meeting before they left for Grove Place. I therefore think it was merely inadvertent that only one was at first told to Smith. For the reasons which I will discuss in relation to Gereau's arrest, infra, I do not think the omission here is controlling; the police were sent to arrest Smith on two charges and, when they took him into custody, they did so on the strength of both grounds as to which the dispatching officer had information.

The trespass charge is somewhat troublesome as an alternative basis for Smith's arrest, since it appears to be more nearly a "pretext" matter than does the charge of accessory after the fact. But even the trespass charge may be distinguished from those pretext arrests which have been held invalid. It is a somewhat more serious offense; and it was pressed by a private citizen who was entitled to a response, rather than being a product of the officers' discretionary authority. Even if the trespass charge were found invalid on pretext grounds, however, it would not taint Smith's simultaneous and nonpretextual arrest as an accessory. Klingler v. United States, 409 F.2d 299 (8th Cir. 1969), cert. denied, 396 U.S. 859 (1970) (arrest valid even though nonpretextual ground was not told to the arrestee).

The police may also have had probable cause to arrest Smith on a third charge, as a participant in the Fountain Valley murders. He was known

■ *2. Gereau.*—Gereau was initially arrested on the morning of September 8th, in Frederiksted at 46 Prince Street, by Officer Hodge. This arrest was apparently improper. Hodge is from St. Thomas and understood that a warrant for Gereau had been issued by the Municipal Court on that island. Gereau was taken into custody under this authority. As it happened, however, Hodge had only heard a St. Thomas judge state that a warrant would be issued. The warrant was not actually signed until September 8 —the day of Gereau's arrest—and the record is cloudy as to whether it was signed before or after the arrest itself. I am unwilling to assume from that cloudy record that it was signed before the arrest, particularly since the Government failed to produce the witnesses who could have conclusively established these facts. While Officer Hodge's initiative would have been commendable in most circumstances, I must find, and I so ruled during the hearing, that here there was a warrantless arrest.

Of course, mere knowledge that a judge has determined to issue a warrant in the near future might itself constitute probable cause. But even with probable cause, a warrantless arrest may be made only for certain categories of crimes. In the Virgin Islands, unless the offense is committed in the presence of the officer, a warrantless arrest may be made only for a felony. 5 V.I.C. § 3562. In this instance, however, Gereau was not charged with a felony. The underlying charge on which the warrant finally issued was for simple assault and battery, a misdemeanor under 14 V.I.C. § 299. Even if we assume that Gereau was also wanted for his failure to appear in Court on this charge, that contempt would likewise be only a misdemeanor under 14 V.I.C. § 585. Since these offenses will not support a

---

to have been associated with the activities of La Beet, Ballentine and Joseph shortly before. Whether there was probable cause to arrest him would therefore depend on whether there was probable cause to arrest the trio on this charge. That issue is discussed below in the text.

warrantless arrest, I hold that Gereau was improperly taken into custody on the morning of September 8th.

█ It does not follow, however, that Gereau was never properly arrested or that his statements were taken during a period of illegal detention. As soon as information of Tuitt's statement reached the officers holding Gereau they had adequate legal grounds for his continued detention.[21] Tuitt's statement implicated him as an accessory after the fact to the same degree as Smith. Gereau may therefore be considered as having been validly "rearrested" at the time this information became available.[22] The law in general is admittedly and quite properly hostile to first arresting a suspect and subsequently developing information constituting "probable cause" for his detention. E.g., Rios v. United States, 364 U.S. 253, 261–62 (1960). But I believe such cases are distinguishable. The arresting officers here did not use the post-arrest period to uncover evidence justifying their original action. Instead, new and entirely different grounds were acquired independently of Gereau's arrest, grounds based solely on information in police hands *before* that arrest and thus in no sense "fruits" of any impropriety connected with it. The short period of time between Gereau's arrest and the acquisition of independent probable cause reflects not the kind of reprehensible police conduct which exclusionary rules combat, but rather, under the confused circumstances of the day, only the time necessary for information within various units of the police department to be exchanged and coordi-

---

[21] Some of the officers with Hodge at the time of Gereau's arrest may have been aware of Tuitt's information. This is by no means improbable, since about thirty policemen attended the 3:00 a.m. briefing before Smith's arrest. If so, then Gereau's arrest would be immediately justified on the same grounds as Smith's. More information would be needed to decide this point, however, since it was not explored at the hearing.

[22] The rearrest would have occurred no later than the evening of the 8th, since at that time Gereau and Miss Schrader were both present at Fountain Valley. It more probably occurred earlier that afternoon, when Gereau was suddenly removed from a car which was taking a number of interviewees away from Fountain Valley.

nated. A number of cases therefore indicate that the invalidity vel non of a first arrest does not affect the validity of a second arrest based on independently acquired probable cause. See Brown v. United States, 365 F.2d 976, 979 (D.C. Cir. 1966) (Burger, J.); Klingler v. United States, 409 F.2d 299 (8th Cir. 1969), cert. denied, 396 U.S. 859 (1970); Feguer v. United States, 302 F.2d 214, 245–48 (8th Cir.) (Blackman, J.), cert. denied, 371 U.S. 872 (1962); Betancourt v. State, 224 So.2d 378 (Dist.Ct. App. Fla. 1969); Carter v. State, 236 Md. 450, 204 A.2d 322, 323 (Ct. App. 1964); State v. Potter, 3 Conn. Cir. 41, 207 A.2d 75 (1964).

██ The record does not reveal whether the police ever formally told Gereau of the new charges against him, but for three reasons I do not believe this is material. First, informing an arrestee of the charges seems best understood as affecting his right to resist rather than as being a precondition to a valid arrest.[23] Second, from the progress of his interrogation, Gereau was in fact aware of why the police were holding him, if only in an informal way. And thirdly, there is considerable precedent to the effect that whether or not a defendant is told of the cause for his arrest is not controlling—custody plus probable cause are themselves sufficient to validate an arrest. See Brown v. United States, supra, at 979; Bailey v. United States, 389 F.2d 305 (D.C. Cir. 1967); United States v. Hensley, 374 F.2d 341 (6th Cir. 1967), cert. denied, 388 U.S. 923 (1967); Barnett v. United States, 384 F.2d 848 (5th Cir. 1967); Reed v. United States, 401 F.2d 756, 761 (8th Cir. 1968), cert. denied, 394 U.S. 1021 (1969). I understand the law of the Virgin Islands to follow this rule. See, e.g.,

---

[23] See Ker v. California, 374 U.S. 23, 54–56 (1963) (Brennan, J., concurring and dissenting); Klingler v. United States, 409 F.2d 299, 306 (8th Cir. 1969), cert. denied, 396 U.S. 859 (1970). I construe 5 V.I.C. § 3565(c) (officer must inform person arrested of charge) to have this purpose only, and thus not to apply to one already in custody.

Wilson v. Porter, 361 F.2d 412, 416 (9th Cir. 1966) (state law determines when an arrest is made). I therefore hold that Gereau was properly in custody when he gave his first statement on September 9th.[24]

---

[24] Gereau was also validly rearrested on a second charge, possession of firearms and dynamite. About two hours after his initial arrest at 46 Prince Street that house was searched by a number of policemen. Under the floorboards they discovered three unregistered rifles, about ten sticks of dynamite, and some detonators. Although it is not clear what prompted this search it is certain that it was not a fruit of Gereau's arrest. All parties deny that Gereau told the arresting officers of this contraband and the search was never justified as one incident to an arrest. It was instead properly based on permission from the owner of the house, Mrs. Hardcastle. As a result of this search and its discoveries, Gereau and four other young men were charged in Municipal Court with possession of this material. The decision to charge Gereau with this offense was made only a few hours after his arrest, and according to his own testimony Gereau was made aware of the police discoveries at about that same time.

The Municipal Court admittedly reached a contrary decision as to the propriety of that search. Of the five defendants in the "rifles and dynamite" case, two moved to suppress the tangible evidence as the product of an illegal search. After a hearing the Municipal Court granted this motion, although without deciding on the merits whether the police had obtained a valid consent to their search. The trial judge instead ruled that the police could not testify as to the terms of consent given by Mrs. Hardcastle on the grounds that this would be hearsay. Since the police were not prepared to demonstrate the consent in any other way the search was ruled illegal. The remaining three defendants thereupon secured suppression of this evidence from the cases against them since the factual transaction was in each instance the same.

I believe, however, that the Municipal Court was incorrect in its interpretation of the hearsay rule. Although the rule is one of the most opaque areas of our law I do not think this testimony would fit the classical definition of hearsay. It would not be the out-of-court statement of a third party, offered to prove the truth of the matter asserted. That is, Mrs. Hardcastle's statements are not being offered to prove what she subjectively thought (although I do not imply by this that she had mental reservations). Rather, they are offered to show what she said, the form of words that were objectively given to the police. This is a matter as to which the listening officer can testify from his own experience, and so it is not hearsay. See Federal Rules of Evidence 801(c) and the Advisory Committee's Note thereon. Although the new Rules are not themselves in effect now, I consider them to be useful restatements of the pre-existing law on the issues that arise in this footnote.

This resolution of the evidentiary problem is consistent with the constitutional policy behind consent searches. The law desires that the police make no "unreasonable" searches, and, by extension, that the consent searches which they do make be "reasonable" ones. But the reasonableness of the officers' conduct must depend on the words that are spoken to them, and if a valid consent is objectively given, then that is enough. We cannot require that the police analyze beneath an apparently valid consent—at least in the absence of coercive circumstances which the record amply demonstrates were not present here. Moreover, even if the police were required to prove such subjective consent, and Mrs. Hardcastle's

90

■ *3. La Beet, Ballentine and Joseph.*—These three defendants were arrested under warrants charging them with the Fountain Valley murders. The defendants urge that these warrants were tainted because they were based on confessions improperly obtained from Smith and Gereau. As will be discussed below, this contention is correct as to Smith but not as to Gereau. The latter's statements alone, however, are sufficient support for the warrants.

Quite apart from the warrants, moreover, the police may have had probable cause to arrest the three for this crime. They had been seen with a gun the night before and in the vicinity of Fountain Valley shortly before the

---

statement therefore became hearsay as to that issue, it would still be admissible hearsay under Rule 803(3).

For three reasons, I do not believe that I am bound by the contrary decision of the Municipal Court. First, that decision turned on a purely "legal" question and so will not be conclusive in a higher court. Even if the trial court's decision were for some reason binding—for example, because the Government failed to perfect its appeal reasonably—it would still be binding only for the "possession" cases themselves. The decision did not embody the sort of factual determinations that should be uniformly decided in all prosecutions which touch upon the same transaction, and so I do not believe that res judicata will apply here. Nor, I may note, was the United States Attorney a party to the earlier cases.

Secondly, the Municipal Court lacked the power to rule on some of the matters that it did. Most notably, Gereau's alleged possession of dynamite would be a felony under 23 V.I.C. §§ 712(a), 718, over which the Municipal Court does not have jurisdiction. Compare 4 V.I.C. § 32(a) with 4 V.I.C. § 74. The illegal possession of firearms would also be a felony if Gereau has been previously convicted of a crime of violence. See 23 V.I.C. ch. 5 and §§ 452, 484. Issues relating to the dynamite matter, at least, are therefore open to original determination at this point.

Given these difficulties with the Municipal Court's jurisdiction, and given the further difficulties of ascertaining whether the Government's appeal from the suppression orders had been properly brought, I have decided to transfer all of the "rifles and dynamite" cases to this court for trial. The appeals will therefore be dismissed as moot. Before the trial of these cases I will entertain argument as to the effect to be given to the Municipal Court's suppression order under the circumstances. At present it is enough to say that that order will not control in this aspect of the Fountain Valley case.

Parenthetically, I should note that the police may also have had probable cause to arrest Gereau on a third charge. That would be as a participant in the Fountain Valley murders. The issues involved here are generally the same as for the defendant Smith, discussed at n. 20, supra. Probable cause against Gereau would have been somewhat stronger, however, since the police had one additional piece of information against him. He had been seen leaving his father's house with a "long gun" shortly before the murders. Although the informant in this matter was not identified, the Government's witness did specify that it was a private citizen who had not previously worked with the police. Cf. n. 18, supra.

incident occurred. Most importantly, an inspection of the scene indicated that an automatic weapon had been used. The police had been informed for some time before that La Beet had a machine gun in his possession. To judge whether these leads rose to the level of probable cause, however, I would desire additional information about the source and credibility of these last reports.[25]

## V. SEARCHES AND SEIZURES

Many searches and seizures were carried out during the investigation of this crime. Of the ones which are relevant here, most were conducted on the premises where the various defendants were arrested and shortly after their arrests. The defendants have challenged the validity of all these searches. I will consider their contentions chronologically here. To anticipate, however, I believe that the searches were reasonable and valid. Accordingly, no evidence will be suppressed on this ground.

*1. Protective Search at Grove Place.*—Just after Smith's arrest outside 160 Grove Place the arresting officers briefly entered his room. Although the policemen did not conduct a search for hidden evidence they did notice in plain view a golf ball, an envelope with letter enclosed addressed to Warren Ballentine, and a note without names of the author or addressee requesting camp supplies, gun oil and shotgun ammunition. These items were seized. The permissibility of this seizure will turn on the validity of the underlying search, which the defendants robustly challenge. It must be initially conceded, as the defendants assert, that the search cannot be justified as incident to Smith's arrest. Vale v. Louisiana, 399 U.S. 30, 33–34 (1970); Chimel v. California, 395 U.S. 752 (1969). Under

---

[25] In addition to any offenses related to Fountain Valley, the police also had other warrants for two of these three defendants. See nn. 15–16, supra.

the special circumstances present here, however, there is ample independent justification for the officers' entry.

 The police officers described the search as one for La Beet, Ballentine and Joseph; and for this purpose it was permissible. The officers had good reason to suspect that these three men might be inside. All five of the present defendants had been reported at the building the previous night, and Ballentine was known to be a sometime-resident there. The three were already strong suspects in the Fountain Valley murders and were therefore presumed to be heavily armed and dangerous. For two reasons their possible presence in the building created "exigent circumstances," Coolidge v. New Hampshire, 403 U.S. 443, 471 (1971), which would justify an immediate warrantless search for them.

First, the officers' own safety had to be considered. They certainly were not required to remain outside, as possible targets for any gunmen within, while a search warrant was obtained. Warden v. Hayden, 387 U.S. 294, 298–99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others"). Nor was there a reasonable alternative to an immediate cursory search. The police should not be expected simply to leave and allow the possible occupants to escape. Thus in United States v. Holiday, 457 F.2d 912, 914 (3d Cir. 1972), a warrantless search of a house from which armed men had previously fled, and which "officers had no way of knowing . . . was empty," was adjudged "imperative and lawful." Accord, Kirkpatrick v. Cox, 321 F.Supp. 284, 286 (D.Va. 1971) (warrantless search of motel room for co-suspects valid even though not incident to defendant's arrest).

Secondly, the officers were justified in assuring themselves that the house was unoccupied in order to alleviate

93

the danger that evidence would be removed or destroyed. True, in Coolidge v. New Hampshire, supra, at 460–61, the Supreme Court found that the guarding of the defendant's wife and premises pending a search warrant was sufficient to nullify any threat of evidentiary destruction. Three men with a machine gun, however, posed a far graver and more immediate threat to any evidence than did Mrs. Coolidge. The only way to parry this threat was an immediate warrantless search of 160 Grove Place for the co-suspects. Cf., e.g., Schmerber v. California, 384 U.S. 757, 770–71 (1966); Chambers v. Monroney, 399 U.S. 42, 51 (1970).[26]

Needless to say, once such a search is held to be justified, the objects inadvertently found by the police during their cursory sweep for La Beet, Ballentine and Joseph are admissible under the "plain view" doctrine.[27] Harris v. United States, 390 U.S. 234 (1968).

*2. Consent Search at Grove Place.*—A second warrantless search of 160 Grove Place occurred some two hours after Smith's arrest.[28] At that time the officers asked Tuitt whether he would consent to a search of the northern section of the house. He signed a written consent form and removed the nail from the door to let them in. Restricting their search to Smith's room, the officers found a ban-

---

[26] In addition to the foregoing arguments, this search is independently justified by Tuitt's consent. Tuitt was the owner of the premises, at least to a degree which enabled him to give a valid authorization to search, as will be discussed below. He was outside around the time of Smith's arrest and gave the officers permission to enter. He may also be considered as having given tacit permission the day before, when he telephoned the police and asked them to remove Smith as a trespasser.

[27] That the golf ball was in plain view is not wholly certain from the record, although it apparently was.

[28] A third search, pursuant to a warrant, was made some two days later. That search is challenged on the grounds that the probable cause for the warrant was established by a fruit of an earlier (and allegedly illegal) warrantless search. Since I have found the prior searches to be proper, however, the warranted search was also proper. In a simultaneous search next door, a Luger was recovered from the roof of the adjacent house. This search was made with the permission of the owner.

danna with eye and nose holes, bullets, and a Fountain Valley matchbook.

■ It is firmly established that consent by one with actual authority validates a warrantless search. E.g., Schneckloth v. Bustamonte, 41 U.S.L.W. 4726 (May 29, 1973) ("the community has a real interest in encouraging consent"). On the other hand, the Supreme Court has frowned upon over-extensions of this exemption from the warrant requirement. E.g., Stoner v. California, 376 U.S. 483 (1964) (doctrine of "apparent authority" cannot justify search of room on consent of hotel clerk). In the present case, the defense has vigorously contended that Tuitt was not the legal owner of the property and had no authority to consent to a search of Smith's room.

I do not believe, however, that a precise ascertainment of legal title will be necessary. While Tuitt's exact legal interest is disputed, I find his quality of occupancy—as compared to Smith's—is unquestionably sufficient to create actual authority to consent. At minimum Tuitt possessed a 1/3 legal interest in 160 Grove Place. The 1972 tax assessment was sent in his name. He had himself constructed the southerly portion of the house. The police knew he resided at that address and believed that he was the owner. Smith, by contrast, did not have the quality of occupancy necessary to render ineffectual Tuitt's consent. He was neither owner nor tenant.[29] Nor was 160 Grove Place his permanent residence: while Smith had lived there off and on for one year, in documents before this Court he repeatedly noted his place of residence as Plot No. 281 Es-

---

[29] Smith claimed in his testimony to have inherited his part of the house from his mother. However, no proof of this assertion was offered. On the contrary, in an Affidavit of Financial Status dated 9/11/72, Smith listed Plot 281 Estate Grove Place as his *sole* asset. Further, he tacitly acknowledged Tuitt's authority over the premises when he sought permission for Gereau to stay there.

Smith, furthermore, was apparently not a tenant; at the suppression hearing he claimed neither to have paid rent nor to have held a lease.

tate Grove Place. Nor did he any longer even have Tuitt's permission to stay at 160. Earlier in the week Tuitt had treated him as a trespasser, locked the door to the room where he was staying, and called the police. Considering all of these factors, I hold that Tuitt had full authority to consent to a search of the room where Smith had been staying.[30]

 *3. Protective Search at 527 Hospital Street.*— Immediately following the arrests of La Beet, Ballentine and Joseph in the doorway of 527 Hospital Street, officers conducted a protective sweep of the premises. This warrantless search was necessary for much the same reasons as justified the search following Smith's arrest. The officers at this time had outstanding arrest warrants for "Sanchez" and "Pepe," thought to be additional participants in the murders, who they might reasonably fear remained in one of the buildings on the premises. Further, La Beet indicated to the officers that at least one weapon had been left inside. Therefore, to safeguard themselves, prevent the escape of suspects, and forestall the destruction of evidence, it was reasonable for the officers to enter. See Warden v. Hayden, 387 U.S. 294 (1967); United States v. Kee Ming Hsu, 424 F.2d 1286 (2d Cir. 1970). The protective search was suitably cursory and upturned only evidence in plain view.[31] I hold it to have been lawful.

---

[30] In addition to being justified by Tuitt's consent, this warrantless search was also proper under the doctrine of "exigent circumstances." The doctrine is of course narrowly restricted lest it swallow the general policy in favor of warrants. But here it is properly invoked. Not only was the crime exceptionally serious, but there was ample reason to fear that the murderers, who were still at large, might commit additional crimes either by design or in an attempt to escape. The facts of this case are akin to those in People v. Sirhan, 497 P.2d 1121 (Calif. 1972). There the Supreme Court of California, in a unanimous and en banc opinion, upheld a warrantless search through the room of Sen. Kennedy's assailant. A political assassination creates, as did the murders here, an inherent threat of additional participants and future violence which should be investigated without delay.

[31] Two shotguns and some other evidence were concededly found under a mattress and out of sight, but this does not mean that the police were conducting a general search. When checking under beds for suspects it is

The defendants further claim that the search was illegal because the warrants for "Sanchez" and "Pepe" were invalid. They urge that these names constitute insufficiently precise identification for a proper warrant. This contention is puzzling, since the technical validity of these documents does not affect the reasonableness of the officers' concern that other armed persons might be present. Gereau had implicated the two named Puerto Ricans to the same extent as the remaining suspects, and the survivors of Fountain Valley indicated that the number of gunmen may have been as high as seven. The officers' concern was legitimate so long as they believed this underlying information on which the warrants were based.[32]

■ *4. Warrant Search of 527 Hospital Street.*—Some two hours after the arrest of La Beet, Ballentine and Joseph, a search warrant was issued supported by affidavits establishing probable cause. The warrant covered the "premises" at 527 Hospital Street. In the course of the ensuing search a machine gun was found in an outhouse behind one of the buildings. The defendants urge that this weapon be suppressed, with their main contention apparently being that the outhouse is not covered by the warrant. They rely primarily on Rising Sun Brewing Co. v. United States, 55 F.2d 827 (3d Cir. 1932) (search warrant does not cover premises across the street). See also United States v. Kaye, 432 F.2d 647 (D.C. Cir. 1970) (search of apartment with different address and entry than store below unlawful).

---

evidently the standard practice to lift the mattress and look down through the springs. The officer is thus less exposed than he would be if he stooped down to peer under the bed directly.

[32] Moreover, it is not entirely clear that these two warrants were invalid. Although the names of "Pepe" and "Sanchez" were incomplete they were believed to be correct as far as they went; these were not John Doe warrants. Additional limiting information was also available, both in the supporting affidavits and in the implication that these suspects might be found in the company of La Beet, Ballentine and Joseph.

I believe that the defendants are here indeed clutching at straws. Unlike Rising Sun and Kaye, there can be no doubt that an outhouse is part of the premises described in the warrant. See United States v. Long, 449 F.2d 288 (8th Cir.) cert. denied, 405 U.S. 974 (1972) (outside trash barrel part of premises); United States v. Meyer, 417 F.2d 1020 (8th Cir. 1969) ("premises" construed to mean land and all buildings thereon); cf. United States ex rel. Stoner v. Myers, 329 F.2d 280 (3d Cir. 1964) (pile of concrete particles and coins near back porch). Whether or not under the same roof, toilet facilities are part and parcel of any living place. To require them to be independently described would be an absurd technicality. Further, the officers were in no way conducting a general exploratory sweep of an area. An automatic weapon was known to have been used in the robbery-murders and was covered by the warrant; when it failed to turn up within the buildings, it was reasonable to concentrate a search for it on the rest of the premises.

Even if warrants generally should not be construed to include outbuildings, the warrant here would still reach the outhouse on the facts of the present case. The judge who issued the warrant did so while standing on Hospital Street in front of the property. The records of that proceeding suggest that the premises to be searched were indicated with a wave of the arm. I believe this shows a desire on the part of the police to search comprehensively within the indicated area, and I believe that this warrant must be construed in light of these facts surrounding its origin.

## VI. MIRANDA ISSUES

There is no dispute that all defendants received timely Miranda warnings prior to confessing. Rather they contend either that they were denied counsel after requesting it, or

that they were questioned improperly without their counsel present. The defendants will be considered individually.

■ *1. Smith.*—Smith was questioned for four days before being allowed to contact an attorney. While his own testimony of repeated requests to call his lawyer is unsupported, there exists independent evidence that his rights were otherwise abused. Brought before Judge Marsh on September 7th, Smith in answer to the question, "Do you have a lawyer," replied in the affirmative. Assistant Attorney General Resnick testified that on the 8th Smith inquired about an attorney. A full confession was not elicited until the 9th. I need not probe the evidence further; for me the above is sufficient to show Smith's constitutional entitlement to have counsel during interrogation was denied and that no intelligent waiver of rights was made.[33] *Miranda v. Arizona*, 384 U.S. 436, 470–71, 475 (1966). While Smith may not at first have clearly articulated his desire for a lawyer, his wishes were made sufficiently clear at the time of his colloquy with Judge Marsh. Resnick's testimony confirms that Smith indeed desired counsel. After each of these occasions, I believe, the Government had an obligation to either procure a lawyer or else terminate the questioning. A knowing waiver certainly cannot be affirmatively found, and his statements will therefore be suppressed.

■ *2. Joseph.*—Joseph testified that after being read his rights by an FBI agent he refused to sign the waiver form and told the agent he wanted to see his attorney. The agent's testimony and FBI records confirm this. Thereupon Joseph was left with local authorities who questioned him for over an hour. The agent then returned and ques-

---

[33] I am aware that in Government v. Malone, 8 V.I. 459, 457 F.2d 548 (3d Cir. 1972), it was held that Miranda does not apply to cases where the person is interrogated about crimes unrelated to that for which his arrest was made. I do not believe Malone reaches the present case because of the close factual connection between the charge of accessory on which he was arrested and the crime at Fountain Valley.

tioned him for five and one-half hours. I find such procedure an obvious violation of Miranda. Joseph's demand for a lawyer was unequivocal and corroborated by the FBI itself. His statements must likewise be suppressed.

 *3. La Beet.*—La Beet claims that upon his arrival at Fountain Valley he demanded to be put in contact with his lawyer. The only corroboration comes from defense witness Powell, whose testimony I have already discounted.[34] In opposition the Government has offered considerable testimony that La Beet made no request for an attorney. I cannot believe La Beet's account here, principally because I have found his relation of other matters to be untrustworthy. Moreover, had a request for a lawyer been made I believe this fact would have been recorded as it was for Joseph. I find, therefore, that La Beet made no request to speak with an attorney prior to questioning.

 Further, I find that the Government has carried its "heavy burden" of showing that La Beet knowingly and intelligently waived his right to counsel during interrogation. Miranda v. Arizona, supra, at 475. La Beet was read the Miranda warnings immediately after his arrest, again on the way to Fountain Valley, and again when he arrived. He then read the waiver form to himself, indicated that he understood it, but did not sign. He did answer questions, however, confessing that afternoon to his participation in the robbery-murders. I have found there was no compulsion by brutality. There was no lengthy incommunicado detention. La Beet's requests for drink, cigarettes, and use of a toilet were met. Nor was La Beet mentally intimidated or was his will overborne. He is twenty-five years old, has a 10th grade education, and has

---

[34] Powell testified that someone went to call La Beet's lawyer and returned to report that his secretary said he was then in Court. The secretary testified that a telephone call was received after La Beet's arrest but thought it was on a day the lawyer was travelling to New York. It has been stipulated that the lawyer in fact left for New York on the next day.

served in the military. I have personally observed that he is intelligent and articulate. In sum, I find his admissions were the result of his voluntary choice to forego the benefit of counsel.

 *4. Ballentine.*—As with La Beet, I give no weight to Ballentine's claim that he requested a lawyer due to his demonstrated untruthfulness. I find that no request for a lawyer was made by him and, further, that he knowingly and intelligently waived his right to counsel. Ballentine was advised of his rights at the arrest scene, en route to Fountain Valley, and again upon arrival. Some initial background questioning ensued. At 6:20 p.m., he was again advised of his rights by FBI agents. He told the agents that he understood, but that he did not wish to sign the waiver form. But he also said he would answer questions, which he did. During this interview Ballentine's requests for food and drink were satisfied and no coercion was applied. By 8:15 he had admitted his participation in the robbery-murders. Under such circumstances I do not hesitate to hold that he voluntarily waived his right to counsel during the interview.

*5. Gereau.*—Gereau was informally questioned after his arrest on the 8th. The evidence showed that he received his advice of rights, read the waiver form, but declined to sign it. Within an hour he admitted aiding the fugitives, La Beet, Ballentine and Joseph. He concedes that no compulsion was exercised upon him during this interview. His requests for food and drink were met, and the interrogation ceased when he indicated after three and one-half hours that he was sleepy. Gereau is a mature individual of normal intelligence with an 11th grade education. I find a valid waiver of his rights to counsel on the 8th.

After a night's sleep Gereau was reinterviewed at 7:30 a.m. True, the period of incommunicado detention had by then lengthened to a point where serious doubts as to vol-

101

untary waiver might often be raised, Miranda v. Arizona, *supra*, at 476. I do not feel such doubts under the particular circumstances here, however. Gereau was again advised of his rights in the morning and a lengthy breakfast was permitted. The periods of actual questioning were not excessive. Gereau does not claim that at any time he requested an attorney. I therefore find that he continued the interview voluntarily on the morning of the 9th, and that his waiver of his rights was knowing and intelligent.

 A different conclusion must be reached, however, with regard to a further interview of Gereau conducted on September 14 without an attorney present and without Miranda warnings. On September 9th, Judge Marsh had appointed counsel to represent him. A serious question thus arises as to the propriety of law officers interviewing detainees without contacting their attorneys. See United States v. Smith, 379 F.2d 628 (7th Cir. 1967), cert. denied, 389 U.S. 933 (1967). Indeed, at the end of the interview Gereau indicated that he wished to consult his attorney before showing officers the location of various evidence alluded to in the questioning. Thus it seems likely that Gereau did not affirmatively wish to waive his right to the presence of his attorney at this session. If he had been advised of his rights beforehand, he might well have insisted that counsel be present at all times. I will therefore suppress his statements made on that day.

## VII. DELAY IN PRESENTMENT

 Finally, although the confessions of Gereau, La Beet and Ballentine have not been suppressed on any of the previous grounds, these defendants have also sought to exclude them under an alternative theory. This is for violation of Rule 5(a) of the Federal Rules of Criminal Procedure, which provides that an arrestee shall be brought

before the nearest available magistrate "without unnecessary delay." This rule contemplates that a defendant should be judicially informed of his rights, given court appointed counsel where necessary, and admitted to bail where appropriate—all at the earliest practical moment. The rule is premised on the fear that a defendant, if he is closeted with the police for a long period immediately after his arrest, may be overborne into giving damaging statements. See Mallory v. United States, 354 U.S. 449, 454–55 (1957); McNabb v. United States, 318 U.S. 332 (1943); 1 Wright, Federal Practice & Procedure § 72. Statements in these circumstances may not be demonstrably "involuntary," yet they are still at odds with our accusatorial scheme of criminal justice. Because erosion of this scheme would be so subtle the rule has been made a prophylactic one. Any statement taken during a period of "unnecessary" delay is to be excluded from evidence. Id.

At first impression the defendants seem to have a strong argument under the McNabb-Mallory rule. There was a substantial interval between the arrest and presentment of each defendant. This interval was some eight and a quarter hours for La Beet and Ballentine, and some thirty-two hours for Gereau. Delays far shorter than these have been found unreasonable and have resulted in suppression of any confessions that the police had obtained. See, e.g., 18 U.S.C.A. Rule 5, nn. 53, 60.

Nonetheless, on the facts of the present case I hold that these delays were not excessive. Rule 5 does not establish a bright-line test by specifying a particular time within which the defendant must be brought before a judge. It instead acknowledges the complexity of law enforcement by prohibiting only "unnecessary" delay, thus establishing, within limits, a "totality of the circumstances" test. In applying such a test here I am mindful that judicial construction should advance the underlying purpose

103

of a rule; but it should do no more, and the rule should not be construed to reach further than its purpose and thus bring about the pointless exclusion of evidence. The purpose of Rule 5, as I understand it, may be formulated in two ways. It seeks to avoid delays that are not caused by compelling external circumstances; and it seeks to avoid delays which may be used in derogation of the defendant's rights. I believe that neither formulation of its purpose was jeopardized in this case. There was an important motivation for the delays here, in that an early statement could lead to the apprehension of other suspects who were still at large and apt to commit additional crimes. And the delays here were not in derogation of the defendant's rights, since by agreeing to talk with the police after receiving Miranda warnings the defendants had waived having prompt judicial advice of these same rights and the prompt presence of counsel. I will discuss these two considerations in that order.

Compelling circumstances may make a lengthy delay nonetheless a necessary one. The most obvious example is when a magistrate is unavailable at the moment. See, e.g., United States v. Brown, 459 F.2d 319 (5th Cir. 1971). But other circumstances are imaginable, and many cases contain dicta to the effect that the purpose or justification for the delay must be evaluated on a case-by-case basis. See id. at 324, Frazier v. United States, 419 F.2d 1161, 1165 (D.C. Cir. 1969); United States v. Hamilton, 409 F.2d 404, 406 (7th Cir. 1969). The police had a sufficient justification for delay here, since at the time of each delay they believed that additional killers were still at large.[35] The possibility existed that Fountain Valley would be just the first of a number of incidents. Even if not, by this point the remaining participants may have been desperate men

[35] On the day that La Beet, Ballentine and Joseph were taken into custody the police still believed that two additional described persons had participated in the murders.

capable of committing any crime in order to effect their escape from the island. Any time saved in taking a statement from one of the defendants might contribute to the identification and arrest of the others before further violence was committed; and transportation to a judge would have consumed, if not a great deal of time, at least an hour.

Recognition of similar exigencies has been allowed in other cases. In United States v. Hensley, 374 F.2d 341, 349 (6th Cir. 1967) the defendant's presentment was likewise delayed for some hours. He had been caught attempting to dynamite a railroad bridge, and the Sixth Circuit held that the police had properly given their first priority to removing the explosives and attempting to capture the other parties to the crime. The case might be distinguishable in that Hensley was not questioned during the delay, but the court's discussion is at least suggestive as to the kind of situation that would justify questioning as well. A case more nearly in point is People v. Sirhan, 497 P.2d 1121, 1137–41 (Calif. 1972). The Supreme Court of California, in a unanimous and en banc decision, there upheld a warrantless search through the room of Senator Kennedy's assassin. The police need not have taken even the brief time to obtain a warrant since a political assassination raises the possibility of a more widespread plot (with perhaps additional targets) which should be investigated without delay. In other words, I assume, a warrantless search in such circumstances is still not an "unreasonable" one; and I believe that a delay in presentment, in analogous circumstances, is similarly not "unnecessary."

Although I find that circumstances justified the delays involved here, I must underscore the narrowness of my determination. Under the McNabb-Mallory rule, any incremental delay is forbidden when its sole purpose is to extract a confession which will assure conviction for a

105

closed and completed crime. Cf. 1 Wright, Federal Practice & Procedure § 74, n. 93. Moreover, a "reasonable" delay for that purpose is in no way enlarged by the seriousness of the crime itself. See id. at § 74, n. 86. The delay here was instead justified by the need for celerity in obtaining a statement which could aid in the arrest of other persons still at large. That need was brought to the level of a McNabb-Mallory exception due to the high apparent possibility of future violence. The delay was not independently justified by—although it undoubtedly contributed to—the chance that in his statement the defendant would also inculpate himself as a past participant in the crime. I should, moreover, stress that this portion of my opinion is directed solely to the procedural rule requiring speedy presentments. No risk of future violence will justify securing a statement which is not voluntary, and the requirements as to this issue must therefore be independently satisfied. See id. at § 76, n. 51. Since I have previously determined that the statements were voluntary, however, only the procedural requirements of McNabb and Mallory are under consideration at this point. I believe them to have been satisfied under the exigent circumstances exception.

 Alternatively, I hold that the delay was permissible because the defendants' Miranda waivers included a tacit waiver of the right to immediate presentment.[36]

---

[36] Quite apart from the demonstration in the main text that this result is consistent with the case law of the McNabb-Mallory rule, it is now also specifically authorized by statute. See 18 U.S.C. § 3501. Subsection (c) provides that a statement shall not be inadmissible in evidence, solely by reason of delay in presentment, as long as it was voluntarily made. On its face this subsection modifies the McNabb-Mallory rule only for cases where the delay is less than six hours—a period shorter than any involved here. I believe, however, that § 3501 as a whole permits the trial judge to find a statement voluntary even if made after a longer delay—the difference being that with more than six hours he *may* rely solely on the delay in his determination of voluntariness. But if he does find such a statement voluntary after deciding to consider all the other factors listed in subsection (b), then he may admit it under subsection (a). See Wright, supra, at § 72, n. 41.

The McNabb-Mallory rule antedated the Miranda decision, and was intended to assure defendants of certain procedural rights which Miranda later secured to them still more definitely. The two lines of decision are thus cumulative and they have their most important feature in common. That is provision of mechanisms for promptly informing an arrestee of his basic rights—through judicial warnings under McNabb-Mallory and police warnings under Miranda. Since the two rules result in similar cautions being delivered, once the police have read a suspect his Miranda rights there is less urgency to bringing him before a judge.[37] In these circumstances a somewhat longer delay would still be reasonable.[38] See Frazier v. United States, 419 F.2d 1161 (D.C. Cir. 1969).

Rule 5, to be sure, speaks in terms of "necessary" rather than "reasonable" delay. But even if one thinks this distinction significant in the context of a Miranda warning already delivered, it will still not aid the defendants in a case where they have given a valid Miranda waiver. An agreement to talk with the police necessarily contemplates the expenditure of time, and therefore foregoes the right to be brought before a magistrate as quickly as possible. Moreover, the same agreement to talk immediately with the police also implies a waiver, at least for the moment, of the other two benefits which the magistrate might confer—appointment of counsel, and release on

---

[37] Illustrating this point, I did not read La Beet, Ballentine and Joseph their full Miranda warnings when they were first presented before me, since I knew they had been given this information many times that day and it was unnecessary to repeat it in detail. I instead concentrated on setting bail and securing the appointment of counsel since these are the most important functions left to be performed at the presentment.

[38] In assessing the delay involved in Gereau's presentment—which was the most long-deferred—one further consideration might be borne in mind. Judge Marsh of the Municipal Court was telephoned about 3:45 on the day of Gereau's arrest in an effort to decide the proper procedure for presentment. Although the decision reached was to bring him before a judge the next day, the judiciary was thus kept informed of developments and was enabled to intervene if the judge deemed it proper.

bail.[39] For these reasons a number of cases hold that a valid Miranda waiver is also a waiver of rights under the McNabb-Mallory rule. See United States v. Lopez, 450 F.2d 169 (9th Cir. 1971) (per curiam), cert. denied, 405 U.S. 931; Frazier v. United States, 419 F.2d 1161 (D.C. Cir. 1969); Prettyjohn v. United States, 419 F.2d 651 (D.C. Cir. 1969) (alternative ground), cert. denied, 397 U.S. 1058; 1 Wright, Federal Practice & Procedure §§ 72, 74.

For each of the foregoing reasons, and the more so as they are considered cumulatively, I believe that the delays in presentment were not improper.

## VIII. THE QUESTION OF POISONOUS FRUIT

Since Smith and Joseph's statements have been suppressed, they now ask that I take the further step of suppressing all tangible evidence which came to light as a result of those statements. This request turns on application of the familiar "fruit of the poisonous tree" doctrine. If certain evidence has been illegally obtained by the Government, not only is that evidence inadmissible but so is all additional evidence which "has been come at by exploitation of [the original] illegality." Wong Sun v. United States, 371 U.S. 471, 488 (1963), quoting Maguire, Evidence of Guilt 221 (1959); see Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920). The reasons for this rule are persuasive and two-fold. First, the defendant in a particular case should not be placed in any worse position by permitting the Government to indirectly reap benefits from its illegal conduct. To do so would reduce his constitutional protections to a mere "form of words," see Silverthorne, supra, at 392. Secondly, the rule excluding "fruits" also implements a more long-range deterrent strategy and

---

[39] A preliminary examination is not required in the Virgin Islands, for reasons which I explored in the habeas corpus action brought by these defendants. Ballantine v. Hendricks, 351 F.Supp. 208 (D.C.V.I. 1972).

is calculated to discourage further illegal police conduct in the future by denying them the benefits of having used it in the past. See Linkletter v. Walker, 381 U.S. 618, 634–39 (1965).

The defendants have a strong case for invocation of the exclusionary rule here. Although the "poisonous fruit" doctrine was first developed in the context of controlling illegal searches and seizures under the Fourth Amendment, it has expanded into a vehicle for enforcing the other major constitutional rights as well. See, e.g., Gilbert v. California, 388 U.S. 263 (1967) (Sixth Amendment as applied to lineups); United States v. Wade, 388 U.S. 218 (1967) (same). It has also been applied, as the defendants would have me do here, to the fruits of involuntary confessions under the Fifth Amendment. See Harrison v. United States, 392 U.S. 219 (1968); Tucker v. Johnson, 12 Cr.L. 2290 (E.D. Mich., Dec. 22, 1972); 3 Wigmore, Evidence § 859 & n. 7 (Chadbourn rev. 1972). Application of such a rule at first appears appropriate on the facts of the present case, since there is little doubt that important tangible evidence was located only after a defendant had led officers to its hiding place.

Before mechanically accepting this conclusion, however, I must also examine the one important exception to the rule excluding "poisonous fruit." From the very beginning of the doctrine it was recognized that police illegality could not *automatically* make the information thus acquired "sacred and inaccessible." Silverthorne, supra, at 392. Such information, and any resultant evidence, was still admissible if the police had also discovered it through an independent and legal source. This doctrinal exception is currently expressed through the question of " 'whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

109

Wong Sun v. United States, 371 U.S. 471, 488 (1963), quoting Maguire, Evidence of Guilt 221 (1959). The exception is justified by the very considerations that led to the exclusionary rule in the first place. In these circumstances the two purposes of the rule are satisfied without the necessity for actually excluding the evidence. The defendant's rights are not compromised, since, given the alternative source of information, his position is no worse than if the illegality had not occurred. Deterrence of police illegality is similarly unweakened, since they have not been permitted to build any stronger a case than they would have had under purely legal means.

The collateral-source rule alone may permit introduction of the Luger into evidence. This pistol was found on the roof of a house adjacent to the one which Smith occupied at the time of his arrest. On direct examination, Smith testified that he threw it there as he heard the police approach his room. Several officers testified that they heard the clang of a heavy object falling on a tin roof. In addition, one of them reported that this coincided with the swift opening and closing of a back window to Smith's room. Considering the number of policemen that were close to the house, and the loudness of an object striking a tin roof, I find this testimony credible. This information may in turn have led the police to the gun, since such strange noises would clearly have borne investigation.

The record, however, is not entirely clear on this point. The Luger was found on the morning of September 9th, but the testimony does not reveal what prompted this search. We are told only that it was "based on information received." If this "information" was a report from the arresting officers about the suspicious noises, then an independent source is sufficiently established. On the other hand, however, on the evening of the 8th Smith had told the investigators of how he threw the gun away. If this

report was the motive for the search instead, then discovery of the weapon might appear to be a fruit of Smith's statement.

██ ██ I do not think this issue is particularly material, however, since the Luger would be admissible in either event. One application of the independent-source rule will reach this case even if the searching policemen were motivated solely by knowledge of Smith's confession. For want of a better term I shall refer to this application as "the rule of the would-have-been." The rule postulates that a legally independent source exists for the evidence if the police would have discovered it, in time, even without the benefit of the illegal confession. The rule does not require that the police have had an independent route to the evidence *at the same time* that they discovered it through the illegal means.

The rule of the would-have-been may appear troublesome at first glance, for it is one thing merely to recognize the existence of an acceptable alternative basis for the evidence, and quite another to speculate as to whether one would have come into being in the future. Upon closer examination, however, it is clear that the two criteria are not as different as they first seem to be. Probative evidence is excluded from court only reluctantly, and only when necessary to serve some overriding social policy. The rule of the would-have-been must therefore be evaluated—as was the original exception for independent sources—according to whether it jeopardizes those important social goals which the "poisonous fruit" doctrine was formulated in order to protect. It is apparent that it does not. If the police would have found the evidence in any case, then the defendant is not injured as a result of the illegality; and the police remain untempted to enter into illegality, since they are permitted to retain only that evidence which they would also have found under proper means.

Since the rule of the would-have-been thus does not conflict with the purposes of the poisonous fruit doctrine, it should be recognized as a valid application of the independent source rule. If there is a practical difficulty with this theoretical demonstration, it lies in the fact that one can seldom be entirely certain about the course of future events. But such a caveat is not truly directed toward the conception itself, but rather toward the need for carefully ascertaining the proper burden of proof to be placed on the Government. It is to that issue that I now direct my attention.

I believe the Government must show, by clear and convincing proof, that the tangible evidence would have been found even without the confessions. I have arrived at this standard of proof by a process of elimination. It would be too low and lax a standard for the Government to prove the matter by a mere preponderance, and particularly so in a criminal matter. Where the Government "releases the spring" by its own illegality, it should not be able to escape the consequences by setting "too nice a measure of proof." See Harrison v. United States, 392 U.S. 219, 224–25 (1968), quoting DeCicco v. Schweizer, 221 N.Y. 431, 438, 117 N.E. 807, 810 (Cardozo, J.). On the other hand, it would be an impossibly high standard to demand that the Government prove the matter beyond a reasonable doubt. It is difficult enough to meet this standard in proving what actually happened in the past, let alone what would have happened in the future. The Supreme Court, in another context, has already recognized the difficulties of proving what would have happened if events had begun in a different way. See Harrison v. United States, supra, at 224, n. 10 (discussing whether police practices would be different if the exclusionary rule did not exist), citing Elkins v. United States, 364 U.S. 206, 218 ("it is hardly likely that conclusive factual data could ever be assembled").

In a sense my holding will be narrower than the preceding discussion suggests. "Clear and convincing evidence" is not a single or static concept. One may demand that proof be made more or less clear and convincing, depending on the needs of the situation. It is difficult to say just how stringently this phrase should be read for purposes of applying the rule of the would-have-been. This should probably be determined on a case-by-case basis, and I make no attempt here to formulate a general rule. I will hold only that on the particular facts involved in this case, which will be discussed below, the Government has sustained its burden of proof.

In concluding that the rule of the would-have-been is a legitimate exception to the general doctrine of "poisonous fruit," I am supported by a considerable body of case law from other jurisdictions. The leading case appears to be Killough v. United States, 336 F.2d 929 (D.C. Cir. 1964). There a homicide defendant had led the police to his victim's body, as part of a general confession which was later ruled to be inadmissible. The coroner was nonetheless permitted to testify as to the body itself—although not the circumstances of its discovery—with a view to establishing the corpus delicti. The D.C. Circuit upheld this action on the following grounds:

> The mere fact that the body was discovered at the particular time it was discovered because of Killough's disclosure of its whereabouts in his illegally secured confessions is not determinative. . . . In time the body (or its bones) would have been discovered and would have been identified as that of Mrs. Killough.

Id. at 934. Other cases have reached similar conclusions.[40] See Toohey v. United States, 404 F.2d 907, 910

---

[40] I am not aware of any Third Circuit case on point. If one exists that is contrary to my holding here, however, I suspect it may be distinguishable on its facts. The very magnitude of the crime here created the most massive investigation in the history of this jurisdiction. This thoroughness would in turn allow an exceptionally confident prediction that certain evidence would have been found.

(9th Cir. 1968); Wayne v. United States, 318 F.2d 205 (D.C. Cir. 1963) (Burger, J.) (discovery of body during illegal entry); People v. Ditson, 369 P.2d 714, 730 (Calif. Sup. Ct. 1962) (en banc); Duckett v. State, 240 A.2d 332, 341 (Md. 1968); Pfeifer v. State, 460 P.2d 125 (Okla. Cr. 1969) (although perhaps using a questionable burden of proof); 3 Wigmore, Evidence § 859, n. 12 (Chadbourn rev. 1972). A related line of cases holds that if the police learn the identity of a living witness as a result of illegal activity, they may still call the witness if they show that they would have independently discovered him. See Smith v. United States, 344 F.2d 545, 547, n. 4 (D.C. Cir. 1965) (dictum); McLindon v. United States, 329 F.2d 238, 241 (D.C. Cir. 1964) (by implication); Commonwealth v. Cephas, 11 Cr. L. 2241 (Sup. Ct. Pa., May 25, 1972) (dictum).

With the appropriate law thus identified, I will now turn to applying that law to the facts of the present case. Two pieces of tangible evidence are arguably admissible under the rule of the would-have-been, and I will examine them in sequence. These are the Luger found on the roof of a house at Grove Place, and the .410 shotgun found in the brush near Mahogany Road. I have already considered, where appropriate, the legal validity of the seizures themselves. The following discussion will therefore be confined to the question of whether the knowledge leading to those seizures came from a permissible source.

First, I believe that the Luger is admissible. Even if the officers who found the weapon knew only of Smith's confession, the rule of the would-have-been will still apply. I find as a matter of fact that several officers heard the gun strike the roof at the time of Smith's arrest, and that one of them noticed that this coincided with the swift opening and closing of a window to Smith's room. It might have taken a few days for this information to be conveyed to the appropriate investigators, but I have little difficulty

114

finding that it would eventually have reached them. Several reasons lead me to this conclusion. The strange sounds were an obvious lead, and one which clearly needed to be related to the people doing the follow-up investigation. The arresting officers were aware of this significance and did not neglect the matter; I also find as a matter of fact that one of them mentioned the noises to his superior the following day. I do not think that the delay in searching is fatal to the conclusion that a search would have been made. In those early days the police suffered from a certain necessary confusion attendant upon building up and organizing so large an investigation. In addition, the search was at first concentrated on apprehending suspects rather than on locating evidence. But in time order was achieved, and loose leads could be systematically collated in the search for trial evidence. Moreover, by September 9, the FBI agents were arriving in substantial numbers. I think I may assume that they would have reviewed the progress of the investigation, and during the course of this review would have received reports of the suspicious noises. I then conclude that in an investigation as thorough as this one such a lead would have been followed up by a search of the roof and discovery of the gun.

 On the other hand, however, I believe that the ⸴410 shotgun is inadmissible. This weapon was one of the more notable items in a small cache of material hidden near Mahogany Road. The defendant Joseph led the police to this spot, however, only on the morning after his inadmissible confession had been obtained. I believe that his assistance must be considered a fruit of the confession, since it was most likely prompted by his realization that the cat was already out of the bag. Nor can the admissibility of this cache be preserved under the would-have-been rationale. It was well concealed, being some 200 yards from the road and inside a large bush, and nothing in the

record indicates that the police would have found it without Joseph's assistance. Since I have found that Joseph's statements must be suppressed, I also conclude that all tangible evidence taken from this location must be suppressed as well.

In terms of the new rule, the most interesting item of evidence can find its way into this opinion only by way of dictum. The defendant La Beet led the police to his machine gun during the course of a confession which I have held to be properly admissible. Yet I believe that this gun could be received in evidence even if the confession itself were suppressed. I think two purposes would be served by expanding on my reasons for saying this. First, the machine gun provides an excellent illustration for the rule of the would-have-been. And secondly, this application of the rule will show that—even if I erred in admitting La Beet's confession—the gun should still have come into evidence.

Although La Beet showed the investigators where the gun was hidden,[41] it is virtually certain that it would have been speedily found in any event. The gun was admittedly well hidden, being buried beneath the outhouse at the rear of the Hospital Street property. But the forces which the police marshalled in order to locate it can only be described as overwhelming. About forty policemen were at Hospital Street on the evening of the 12th, of whom about twenty were digging around the yard looking exclusively for the machine gun. They were focusing their search outside because the inside of the buildings had already been searched, without locating it, and because the interiors could not be adequately illuminated for night work. The police had considerable equipment for this hunt, in-

---

[41] Ironically, he denies that he gave any effective assistance in finding the machine gun. I do not believe his testimony on this point, however, and instead accept the accounts of several officers that he pointed out the precise spot where it was hidden.

116

cluding a searchlight, a number of shovels, a device apparently akin to a roto-rooter, and ultimately what appears to be some heavy earth-moving machinery. It was, in short, an exceptionally formidable search. Moreover, there is every indication that it would have been pressed until the gun was found. Several officials testified that they were prepared to search the premises for several days. I find this testimony credible, for the police had considerable evidence indicating that the gun was there to be found. Several clips of machine gun ammunition were found in the house; the FBI agents had been told that La Beet was in the habit of always keeping the gun near him; and the other obvious hiding places had already been searched so that the investigators were willing to concentrate their efforts there. In addition, it appears to me that the sheer quantity of other material found at Hospital Street would have suggested that the defendants had made no effort to dispose of possibly-incriminating evidence.

## IX. CONCLUSION

It is difficult to write a conclusion for an opinion with such diverse issues as this one. In sum, however, I believe that the conduct of the investigating officers was generally reasonable in light of the situations with which they were confronted. An exception does arise with respect to the interrogation of some of the suspects which I think was unlawfully prolonged in the face of their demands for counsel. The fruits of this phase of the investigation will therefore be suppressed. The remaining facets of the investigation will be upheld, however, and the case will go to trial with the evidence so obtained.

An Order has already been entered in conformity with this Opinion.